Thank you, Your Honor. And may it please the Court, I'd like to try and reserve two minutes of my time for rebuttal if I can. Just watch the clock. It counts down. The immigration judge's credibility determination in this case was based primarily on his conclusion that two aspects of Ms. Karapetyan's story were implausible. But the judge's error and the reason this Court should reverse is that his implausibility findings were based on the judge's supposition and not on anything in the record. He did not point to any evidence disproving or even calling into question Ms. Karapetyan's testimony. And, in fact, the State Department's country report strongly supports her story. Instead, he said he was, quote, left to speculate, unquote, about whether the Armenian Ministry of National Security would take the actions it did. And he determined they would not. This was error because this Court, in an unbroken line of cases, has held that immigration judges must identify specific and cogent reasons for their credibility determinations and that those reasons must be based on the record. The judge here did not even purport to ground his findings and his implausibility findings in the record and his conclusions were, therefore, erroneous and warrant a reversal. But didn't he reference the record when he found applying common sense that her story just didn't add up? He did reference her testimony, but he did not reference any facts that supported his conclusion that her story did not add up. I mean, the two aspects of her testimony he found implausible were, one, that the ministry would seize an election report when, according to the judge, knowledge of voting irregularities was already widespread at the time. But he relied on a 2005 country report that said nothing about whether, in fact, voting irregularities was widely known at the time, in February 2003, at the time of the election. And there's also no reason to think that the ministry would not want to limit the number of voting irregularities that were published or disseminated. And there's also no reason to think that the ministry would not want to deter people like Ms. Karapetian from doing this in the future, even if the voting irregularities were widespread. There's no evidence in the record supporting his conclusion that the ministry was only concerned with stopping knowledge of voting irregularities if none had gotten out at that point. Well, I understood him to be saying that it was common knowledge that there were voting irregularities and, therefore, her story didn't make sense on why they would select her to curry this report off. It didn't make sense. And it seems that she never inquired about the other people who may have been hurt, as she was. A couple other instances where he sort of challenged and invited her to explain, and there was no explanation. Well, that's correct, Your Honor. That is what he found, is that it didn't make sense. But it didn't make sense to him. It wasn't that there was some fact in the record that called her story into question. He just didn't think that it would make sense for the Armenian Ministry of National Security to do what it did. And he said that voting irregularities were widespread common knowledge at the time. But there's no evidence that that was true. I mean, the State Department's report was filed in 2005, two years later, and looking back said that there was widespread knowledge of voting irregularities. But that doesn't mean that at the time the ministry stopped and arrested Ms. Karapetian, that it was already widespread. There's no evidence suggesting that, and that was in February 2003, long before the Armenian court had ruled on this and the State Department had filed this report. Can you tell me why she didn't have any corroborating evidence? I mean, she had opportunity to do that. She had a family in Russia. She had other contacts, something that would have helped her credibility. Nothing was offered. Her testimony was that she feared for her own safety if she were to contact the institutions in Armenia that held the records that she would use to support her testimony, and that she feared for the safety of her family. Because if she asked them to get the records, then the ministry would go after them. If she had the records sent to her, then the ministry would know precisely where she lives in the United States. Now, wait. They knew she took off to the United States. They knew where her parents lived. They lived there for 40-some years, same place. There's no secret there. If they had wanted to go after her parents, they could have very easily done that. Well, her parents had moved. Her parents had moved, so they did not live in the same place. They did live in the same place for 45 years, but they had moved. And here, I mean, she did have a passport stamp that said she came to the United States. But where in the United States? I mean, the ministry has no idea. So there's no way for them to track her down here, presumably. But if she has the hospital, for example, send records to her address here in Los Angeles, then the hospital knows exactly where she lives, and that's her fear. And more importantly. So why doesn't her husband in Russia, where he and the children are, send the information off? He can get it and send it to her. I mean, there are ways. She feared for her family's safety, too. That's why they went to Russia. It's because she feared that as soon as the ministry found out that she was not coming back and agreeing to be a spy, that they would go after her husband and children. That's why they went to Russia. But more importantly, Your Honor, corroborating evidence is not required. As Your Honor knows, this is not a – that only comes to be an issue when the testimony is otherwise found to be not credible. And our argument is that there was no basis for the judge to find her testimony not credible because in this Court's long line of cases, that determination has to be made on the evidence. And the judge said himself that he was, quote, left to speculate, unquote. He didn't even purport to have evidence supporting his conclusion that the ministry would not arrest and accost someone like Ms. Karapetchin or not arrest a member of the opposition party like Ms. Karapetchin as a spy. The other point that I wanted to address, Your Honor, is the judge's statement that there were inconsistencies in her testimony. And I'm happy to go through them individually if the Court would like, but at a high level, there were no actual inconsistencies in her testimony. He identified, I think, there were six, but most of them were not even inconsistencies. It was the judge simply misreading the record. For example, he found it to be inconsistent that she would know what is in the envelope but not have opened it, but that's not an inconsistency. If someone tells you what's in the envelope, you know what's in it even if you don't open it. We can still support the judge, though, if we accept your brief on the inconsistencies but find that the story defied common sense. That would be an independent and separate ground for which we could uphold the decision. Isn't that correct? I'm not sure, Your Honor, because his credibility determination was based on both the implausibilities and the inconsistencies. So I think Ms. Karapetchan would need a new hearing if some portion of that even fell out. I don't think that she has to knock out every single statement that the judge said in order to affirm the outcome. Isn't it the other way around? Isn't the standard of review the other way around? Well, the standard of review is that he has to identify specific and cogent reasons, and if the reasons he identified. I think Judge Zavarri's question was, and if we disagree with you on that, we could affirm. Obviously, that's not the result you're looking for, but I'm just. Yeah, I mean, in this Court's, in the Court's cases, you know, the cases we cite in our brief, the Court does not address, in some cases, does not address every single inconsistency, but after having found that the judge committed error in the way that he approached the credibility determination, the Court has reversed for a new hearing. I don't think that every single inconsistency has to be disproven in order for her to get a new hearing. You're below two minutes. Thank you. You may reserve. We will hear from the government. Good morning. I'm Stephen Elliott, representing the Attorney General. The petition for review should be denied. Both the Immigration Court and the Board of Immigration Appeals probably found that the petitioner failed to credibly demonstrate her eligibility for asylum, withholding of removal, and cap protection. As this Court is well aware, an adverse credibility determination must be reviewed under the substantial evidence standard, and under that standard, the Court should deny the petition for review unless it is compelled to reach the conclusion that the petitioner was, in fact, credible. In this case, the immigration judge supported its adverse credibility holding by identifying at least four specific cogent factors that go to the heart of the petitioner's claims for relief. Specifically, the immigration judge identified at least two primary inconsistencies between the petitioner's written statement and her testimony during the merits hearing, as well as at least two instances in which the petitioner provided implausible testimony. If the Court is to decide that any one of these factors is supported by substantial evidence and goes to the heart of the petitioner's claims for relief, then the petition for review should be denied. What about all the inconsistencies your opponent cited in his brief, such as slapped versus hit? I mean, really, those don't go to the heart of the case, do they? I disagree. The very basis the petitioner is applying for asylum, she's claiming that she suffered past persecution, and fearing that she'd be harmed if she returned to Armenia, the very basis for those claims are that she allegedly was mistreated, physically abused at the time of her initial arrest by Armenian authorities, as well as in her later questioning. The very crux of her case is that she was physically mistreated, and these inconsistencies go to the very heart of that claim. She, in her written statement, is identifying, although certainly unwarranted, physical intrusion, but it's a much more benign account of what she later discussed during her testimony during the merits hearing. Specifically, in her written statement, she claimed that at the time of her arrest, the extent of the physical mistreatment that she endured was that she was, quote, But during her later testimony, she added much more vivid, colorful details that are indicative of a more violent physical altercation. That's not really inconsistent. One's giving a short version, and the other's giving a more detailed version. There's nothing inconsistent about the two, is there? Well, I'd agree that you can be both dragged from your car, and then in her later testimony, she's saying she was hit and kicked in her stomach, which is particularly important in this case because she's claiming that she suffered a miscarriage. But the point the immigration judge was saying was that she was providing an inconsistent account of the extent that she was physically mistreated, and that's the basis for her claim. Moreover, it's not an instance in which the petitioner was providing sort of a skeletal or general account of her basis for relief in a written statement, and then provided more details during her testimony. Her written statement was, in fact, incredibly detailed. For example, in her written statement, she said that a car pulled out in front of hers, and that car did not have license plates. She claimed that four police officers got out of the car. She said that the police officers were not in uniform, but rather they were in civilian dress. So that's a detailed account by identifying the car, identifying the number of police officers, and identifying what they were wearing. But she only claimed that she was rudely dragged in that written statement. In her later testimony, she provides the same account, that the car didn't have license plates, that the police officers were not in uniform, and there were four of them, but then she now is enhancing her claim. She's claiming that she was kicked and punched. It's a much more violent physical altercation. Where did this I.J. get the expertise to just declare that her story was implausible? He didn't state any good reasons for finding her implausible, and I've read a lot of these Armenian cases where the police have been just as brutal as she described in her so-called enhanced testimony. Well, I think I'd answer by saying that the immigration judge in this court has consistently acknowledged that the immigration judge is in the best position to determine the credibility of the witness before. In this case, for example, the immigration judge said, and this is an implausibility that was not discussed earlier, but that it didn't make any sense that the security forces would want the petitioner to be an informant. And that's because based on petitioner's own testimony, she had at best an arm's-length association with his political party at the height of her involvement. She never attended any meetings. She was a kindergarten teacher. She was kind of a gopher that went to some of the meetings and did errands for them, apparently. On at least one occasion, yes, she was a courier of this report, but at the time of her alleged recruitment, she had not associated with the political party for the 15 months preceding that alleged recruitment. Counsel, why isn't this case controlled by JIBRIL? Are you familiar with JIBRIL? I am, Your Honor. Why isn't this controlled by JIBRIL? It is. In that case, as you're well aware— JIBRIL went the other way and specifically held that the IJ's credibility finding was based on speculation and conjecture. Yes, that's correct, but the standard the court articulated in that case is controlling, specifically that an immigration judge may properly find that an alien provided implausible testimony when that finding is only based on common sense in which there is no specific evidence of the record to contradict that. In this case, the immigration judge identified at least two instances in which the petitioner provided implausible testimony and said, based on the petitioner's testimony that, for example, she had a very tangential relationship with this political organization and no involvement in the 15 months preceding the alleged recruitment, that it made no sense, that common sense dictated that she would not make a very good informant because she was in no position to provide them with any useful information. And that's what the court in JIBRIL explained, that sometimes an alien could come up with any story and unless it was specifically contradicted by evidence of the record, then it would withstand agency scrutiny unless the immigration judge was permitted to apply common sense. And Your Honor is correct that in that specific instance, they found that the immigration judge's finding was speculative. But this case is not. It is properly based on common sense. And it's akin to a case that was cited in JIBRIL, the Singh Power v. INS case. In that case, this court upheld an immigration judge's adverse credibility holding where the immigration judge found that it was implausible that Indian police officers would have suspected the petitioner in that case of being a terrorist sympathizer when the record and the evidence indicated that he had no political affiliations whatsoever. Again, that's similar to our case here where the immigration judge said that it makes no sense that the MNS, the security forces, would want the petitioner to be an informant when the record indicates, the petitioner's own testimony, that she had a very limited involvement with this organization at the height of her involvement and absolutely no association with the political party at the time of her alleged recruitment. What about your opponent's comment that the country report with respect to what was known as widespread irregularities and that it was widely known, that's not what the report said at the time, that it's two years later. Did the IJ misread that? No. In fact, there was another country report in the record. That's from 2004. In that country report, the State Department described a number of factual circumstances that supported its finding that this idea of corruption in the government and problems in the electoral process were widely known. Specifically, the report indicates, I believe it's at pages 123 and 124, that the president of Armenia had initiated a comprehensive program to stop public corruption in the government as early as January 2003, so a month before the February presidential elections. Moreover, there were international observers in Armenia for those elections, which is indicative, again, that both the international community as well as domestically, there were notions that there were problems with the electoral process. Immediately after the elections, the opposition party filed suit in the Constitutional Court claiming such irregularities occurred. Again, the 2000 report certainly supports the immigration judge's finding that these problems with government corruption and problems with the electoral process were known both inside of Armenia but also apparently in the international community at the time. Therefore, it made little sense that they would so aggressively and so violently and go to such great lengths to arrest the petitioner and confiscate their support when Answer me this question, if you will. Your opponent's primary argument seems to be that this IJ is speculating. He's relying on conjecture, and there is nothing that he can tie in the record that would support the conclusions that he reached, because she has answers to what he has asked. Your response to that is? Well, I would first disagree that she has answers for the immigration judge's belief that she was not telling the truth. But what the immigration judge did was properly cite not only evidence in the record, which being this country report, but more importantly, he used his common sense. And again, in Jabril, this court properly found that an immigration judge may base that plausibility determination not only on evidence in the record that may specifically contradict her testimony, but also common sense. And that's what this immigration judge did in the instance he used petitioner's testimony and common sense to find that she was implausible. And just tying this back into our previous conversation, the inconsistencies on the record that we addressed, those are expressed, they are in the record, and they go to the heart of her claim for relief and protection. And therefore, those inconsistencies alone are enough to support the immigration judge's average credibility holding. Thank you, counsel. Your time has expired. Thank you. Mr. Evanson, you have some reserve time. Let me quickly ask you, I'm looking at page 123 of the record, which was cited by your opponent. And it does say, this is with respect to 2003, authorities harassed opposition supporters, including arrests. More than 200 persons were detained between the two rounds of the presidential election. It's a pretty clear cut. That's exactly right, Your Honor. That supports Ms. Karapetian's testimony because that's exactly what she says happened to her. Or maybe I'm not understanding your question. The country report talks about harassment, arrests, detention, and that it all was centered in Yerevan. And Ms. Karapetian lived in Yerevan, and she was arrested and detained as a result of reporting these election irregularities. And let me just start with Jabril, Your Honor's question. Jabril specifically rejected the argument that the government is making that common sense is a basis for an adverse credibility to determine, especially where, as here, it's not a matter of common sense. It is not a matter of common sense what sorts of measures the Armenian Ministry of National Security would take to squelch the publication of election irregularities. Well, I suppose that's how you define common sense. But common sense can support NIJ? Or are you saying it cannot? I'm not aware of a decision by this Court holding that common sense divorced from the record can... Well, not divorced from the record, but a review of the record in applying common sense can support NIJ's decision. Well, maybe in a very clear-cut hypothetical where, in fact, the question of plausibility is a question of common sense. But that's not what's at issue here. And let me just, you know, with respect to the... This question, sorry to interrupt you. If we fine for you, what's the relief that's appropriate? Do we remand for a new credibility finding? Do we remand for the opportunity to provide corroborating evidence? What's the relief? I think remand for a new hearing, a new credibility hearing in which Ms. Carapace... We actually don't represent Ms. Carapace. We're amicus, but where she can bring forth corroborating evidence if she wants. But a new hearing with a new immigration judge would be our request. And let me just speak briefly. I know my time is running out. Your time has expired, counsel. Okay. Thank you very much. The case just argued will be submitted for decision.
judges: Zouhary, Goodwin, O'Scannlain